SATTERLEY v. CITY OF FLINT.

1. MUNICIPAL CORPORATIONS — CONSTRUCTION OF CHARTERS — AMBIGUITY.

A city charter is not open to construction as a matter of course but only where the language used requires interpretation, where it is ambiguous or where 2 or more constructions can be placed upon it, or where it is of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning.

2. WORDS AND PHRASES—CHARTERS—EVIDENCE OF MEANING.

Words used in a charter have no meaning in and of themselves, but only by custom and usage and agreement is a particular meaning attached to a particular word signifying a relation to either a tangible or an intangible object, and the meaning is a question of fact upon which courts should never exclude relevant evidence.

3. SAME—CONSTRUCTION OF CHARTERS.

The determination by a court that words used in a charter are either clear or unclear, ambiguous or unambiguous, is a judicial construction, whatever the conclusion may be.

4. MUNICIPAL CORPORATIONS—FIREMEN—COMPENSATION.

Consideration is given to the fact that certain benefits are afforded city firemen, that are not accorded other city employees, in determining whether or not their compensation is equal to that of other city employees for their average work week as required by civil service provisions of the charter (Flint Charter, §§ 36A, 236[a], 264[d]).

5. SAME—CONSTRUCTION OF CHARTERS.

The provisions of one portion of a city charter must be construed with other particularly related provisions which add meaning.

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 5, 6] 37 Am Jur, Municipal Corporations § 102 et seq.
[4, 7, 8] 37 Am Jur, Municipal Corporations § 255 et seq.
[9] 14 Am Jur, Costs § 91.

6. SAME—CONSTRUCTION OF CHARTER—COMPENSATION FOR NORMAL WORK WEEK OF CITY EMPLOYEES.

> The terms *normal, work,* and *week,* as used in city charter provision requiring that city employees shall receive the same compensation consistent with their length of service in their particular occupational level where their *normal work week* involves the same number of hours, *held,* each to require clarification, definition, and construction not contained in the charter (Flint Charter, § 264[d]).

7. SAME—FIREMEN—COMPENSATION.

> Plaintiffs, city firemen, in class action for claimed additional wages on basis of average 63-hour work week *held,* not to have a normal work week of such duration in view of special provisions in the city charter as to their periods of service, the out-of-normal nature of their employment, the legislative history of what was intended in adopting city charter amendment relative to equality of compensation among city employees for employment at some occupational levels, by what was done in the pay ordinance immediately thereafter, and by the actions of all concerned, the city, its citizens, and the firemen, over a period of more than 8 years, and fact that firemen's hours on duty had previously been equated to 44 work hours before the amendment (Flint Charter, § 264[d]).

8. SAME—FIREMEN—ON DUTY—WORK WEEK.

> Hours of work are, normally, a basic yardstick for measuring compensation for employment, but hours spent in sleeping, even on the job, are not normally considered to be working hours although some benefit may accrue to the employer, hence, where city firemen were *on duty* an average of 63 hours per week, the equating of such total hours on duty to 44 work hours entitled them to compensation for the 44-hour period (Flint Charter, §§ 36A, 236[a], 264[d]).

9. COSTS—PUBLIC QUESTION—FIREMEN—COMPENSATION.

> No costs are allowed on appeal in class suit by firemen to collect additional pay based on claimed average work week of 63 hours rather than equated 44-hour week, a public question being involved (Flint Charter, §§ 36A, 236[a], 264[d]).

Appeal from Genesee; McGregor (Louis D.), J. Submitted February 6, 1964. (Calendar No. 45, Docket No. 50,005.) Decided June 1, 1964. Rehearing denied July 8, 1964. See opinion filed July 10, 1964, on page 115.

Class action by Richard Satterley and others against the City of Flint, a municipal corporation, to determine the claims for additional wages of more than 200 employees of the city's fire department. Judgment for plaintiffs. Defendant appeals. Reversed.

/

*Milliken & Magee, Baer & Parker, Norman D. Goetzke, James C. Moran, Leitson, Dean, Dean & Abram,* and *Michael Mason* (*William J. Pierce,* of counsel), for plaintiffs.

*Edward P. Joseph,* City Attorney, *Wade D. Withey, Richard R. Lovinger,* and *Charles A. Forrest, Jr.,* Assistant City Attorneys (*Charles H. Clarke,* of counsel), for defendant.

ADAMS, J. Plaintiffs, employees of the fire department of Flint, brought a class suit for compensation, claiming they should have been paid for 63 hours per week instead of 44 because of an amendment to the city charter, adopted October 23, 1951. The trial judge granted them judgments in excess of $3,000,000. The defendant city appeals.

The city of Flint charter was adopted in 1929 and then provided that the compensation of city employees should be prescribed by the city commission. In 1935 a civil service amendment was added to the charter and the principle was set up that:

"Like classifications of work are to receive like compensation."

On January 22, 1951, Flint's mayor appointed a citizens' committee to study the question of revision of the charter. Foster Roser, civil service director, advised this committee and suggested the language which later became section 264, the section under which this suit was brought. His suggestions are

contained in a letter dated March 13, 1951. He pointed out that the civil service amendment was 16 years old and that during those years experience was gained from which recommendations could be made for strengthening the amendment. Dealing with the problem of compensation of city employees and the principle of equal pay for equal work, Mr. Roser advised that because of certain legal interpretations of the charter by city attorneys:

"This basic compensation principle has become today almost totally ineffective to the point that *different compensation* and wage administration *plans have been adopted by the general city departments, the board of hospital managers and the park and recreation board.*" (Emphasis supplied.)

Mr. Roser then went on to say:

"The inability to carry out compensation aspects which most administrators, employee groups and employees believe are embodied in the charter has caused problems in recruitment, classification and employee morale, as well as continuing criticism of this commission for its inability to enforce an intelligent compensation program. Without an *intelligent approach* to compensation, many personnel operations are to a considerable extent nullified. *This particular section* of the charter *should be clarified to prevent legal* and political *interpretations inconsistent with* not only *what was originally intended* but contrary to good personnel administration." (Emphasis supplied.)

The numerous recommendations of Mr. Roser as director of civil service were considered by the mayor's committee and on June 25, 1951, that committee transmitted its report to the mayor and city commission of Flint. In the report the committee said:

"Section 236(a) of the present civil service amendment provides that, *'Like classifications of work are to receive like compensation.'* It appears obvious that problems arising from classification and recruitment of employees and problems directly connected with employee morale can be kept at a minimum only by proper observance of this provision. The importance of preparing proper classifications can hardly be over-emphasized. * * * This provision has not been uniformly observed by city commissions when enacting salary ordinances fixing the compensation for the various occupational levels.

"The director of civil service has submitted to us for consideration a proposed new section 264 to supplement the existing section 236(a) and a copy of the same is attached hereto. This should be given favorable consideration." (Emphasis supplied.)

The amendment was adopted by the voters of the city of Flint on October 23, 1951. For convenient reference, section 264 is printed in the margin.*

---

* "Section 264. Compensation:

"(a) There shall be a single, uniform pay plan for all classified employees of the city, whether they be under the jurisdiction of the city commission, board of hospital managers, or the park and recreation board. The uniform pay plan shall be integrated with the classification plan as adopted by the civil service commission and amended and altered by said commission from time to time.

"(b) The pay plan shall incorporate the occupational levels of the classification plan as well as the allocation of classes to the occupational levels as determined through evaluation by the civil service commission. All classifications allocated to the same occupational level by the civil service commission shall be considered as 'like' classifications as referred to in section 236(a) of the city charter.

"(c) There shall be a salary and/or hourly-rate range for each occupational level, each range having 2 or more within-level pay rates, to provide orderly pay increases over and above the induction rate of wage range. Discretionary rates may be established within the higher occupational levels for administrative personnel.

"(d) All employees whose positions are within the same occupational level, and whose normal work week involves the same number of hours, shall receive the same compensation consistent with their length of service in said level. Compensation for normal work weeks involving a greater or lesser number of hours shall be directly proportional. Nothing herein contained shall prevent the establishment of discretionary compensation beyond the compensation established for an occupational level if the civil service commission shall approve such discretionary compensation.

Previous to the adoption of section 264, and for years thereafter, the plaintiff firemen were paid their compensation pursuant to pay ordinances passed by the city commission which provided substantially:

"Members of the division of fire   *   *   *   who have a 63-hour work week shall be paid on the basis of a 44-hour work week for their respective classifications in the compensation plan."

The arrangement of 44 hours pay for an average of 63 hours per week on the job, according to the testimony of Director Roser, was to equate the salaries of the firemen with the policemen who were working a 44-hour week. This testimony was substantiated by that of John W. Proctor who succeeded Mr. Roser as director of civil service in Flint from 1952 to 1959, who also testified that there was a uniform practice of paying firemen and policemen the same rates.

Actually the firemen were not engaged at any time in a 63-hour week. They have an 8-week cycle consisting of 5 work weeks of 72 hours (three 24-hour on-duty periods in a week) and 3 work weeks of 48 hours (two 24-hour on-duty periods in a week) which average out to 63 hours per week.

---

"(e) Within-level pay increases as provided in the pay plan shall be in accordance with stipulated periods of time worked in a given level, provided however, that no employee shall be entitled to receive a within-level pay increase unless his service ratings have an average or above-average individual service rating score for the rating period immediately preceding the date when the said increase is to become effective.

"(f) The civil service commission shall conduct wage surveys not less than once every 2 years to determine the propriety of existing salary and wage schedules. If factors entering into wage determination suggest a wage revision of such schedules by 5% or more, either upward or downward, such report thereon shall be made to the 3 units of government having responsibility for revision of the pay plan and appropriate action may be taken to incorporate such revision into the pay plan, consistent with the city's financial condition."

The fireman's 24-hour period of duty begins at 7:45 in the morning. He has a morning work schedule, 1 hour for lunch, recreational privileges after 11 a.m., if not in conflict with assigned duties, and he has no routine duties after 6 p.m., except when on telephone watch. Dormitories are provided for sleeping. He may retire after 8 p.m. He must remain on duty for the 24-hour period. The records of the fire department for the period of May, 1960, to May 1961, show that in the average 63-hour week an average fireman spent 76.7 minutes on emergency fire runs, away from the station, including false alarms. This did not include time cleaning rigs and equipment, or other activities such as dragging the river for bodies, fighting "dump" fires, or being on "fire watch" in insure that a fire does not rekindle. Firemen may ride city of Flint buses when in uniform without payment of fares. They are furnished with uniforms, except for minor items, and they receive other incidental benefits.

From the adoption of section 264 in 1951 until June 13, 1960, when the plaintiffs first claimed that they had been paid in violation of that section, although the firemen were represented by 2 union groups that made many demands for raises of pay and shorter work weeks, neither group ever claimed that section 264 could be interpreted to mean that the firemen were legally entitled to 63 hours pay rather than 44 hours.

Plaintiffs' claim is based on that portion of section 264(d) which provides:

"All employees whose positions are within the same occupational level, and whose normal work week involves the same number of hours, shall receive the same compensation consistent with their length of service in said level. Compensation for normal work weeks involving a greater or lesser number of hours shall be directly proportional."

Plaintiffs say this language is so clear it does not require construction or any interpretative aids and that it would be improper to go beyond the words themselves to ascertain their meaning. In support thereof plaintiffs cite *People* v. *Lowell,* 250 Mich 349, 359, which approves the rule from Black on Interpretation of Laws, p 36:

" 'Even though the court should be convinced that some other meaning was really intended by the law making power, and even though the literal interpretation should defeat the very purposes of the enactment, still the explicit declaration of the legislature is the law, and the courts must not depart from it.' "

The trial judge agreed even though he found that the plaintiffs "are about to be awarded or may be awarded a windfall by way of accrued salary earned unbeknownst to them."

Is the language of section 264 (d) of the 1951 charter amendment so clear and unambiguous that this Court cannot look to the interpretative aids, many of which have already been set forth in this opinion, available for its use?

One test was suggested by *City of Lansing* v. *Township of Lansing,* 356 Mich 641, 649:

"A statute is not open to construction as a matter of course, but only where the language used in the statute requires interpretation—where it is ambiguous *or where 2 or more constructions can be placed upon it,* where it is of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." (Emphasis supplied.)

If this standard alone were relied upon considerable weight could be given to the fact that the city of Flint and the firemen at no time from 1951 until 1960 disagreed as to the proper interpretation of the section. The construction given to the charter

by both parties for more than 8 years cannot now be said to have been an unreasonable interpretation, which, when placed alongside of plaintiff's present interpretation, brings section 264(d) squarely within the rule of *City of Lansing* v. *Township of Lansing, supra.*

A second standard is suggested by 2 Sutherland's Statutory Construction, § 4502, pp 316, 317:

"The most common rule of statutory interpretation is the rule that a statute clear and unambiguous on its face need not and cannot be interpreted by a court and only those statutes which are ambiguous and of doubtful meaning are subject to the process of statutory interpretation. This rule hides, although it uses many words to disguise it, the basic fallacy that words have meaning in and of themselves. Shakespeare exposed this fallacy long before the semanticists elaborated his thesis, when he said: 'That which we call a rose by any other name would smell as sweet.' A word is but a symbol which may stand for 1 of an innumerable number of objects. It is only as custom and usage and agreement attach a particular meaning to a particular word that it has any significance in relation to either a tangible or an intangible object. Thus the words used in a statute are always of uncertain meaning.

"At the risk of misleading the reader, a legislative draftsman must select a word familiar to himself and strive to use it in a fashion which will create upon the reader the intended impression of the thing for which the word stands. Thus, the assertion that a statute which is 'clear and unambiguous' needs no interpretation is, in fact, evidence that the court has considered the meaning of the statute and reached a conclusion on the question of legislative intention. In many instances this will be a proper conclusion, but frequently it merely disguises the court's unwillingness to consider evidence other than the court's own impression of what the legislative in-

tent is.  Courts should not lose sight of the fact
that statutory interpretation, whatever it may be
called so far as the function of courts and juries
is concerned, is a fact issue.  Where available, the
courts should never exclude relevant evidence on
that issue of fact."

Application of this standard to section 264(d)
will require that the terms used therein—"compensa-
tion" and "normal work week"—be clear indeed to
exclude the otherwise relevant evidence.  Our de-
termination that these words are either clear or
unclear, ambiguous or no, will be a judicial construc-
tion whatever that conclusion may be.

The word "compensation" is used 5 times in sec-
tion 264(d)—twice in the portion of that section
here under consideration.  It is also used in other
sections of the charter which must be read along with
section 264(d) to place this word in its proper con-
text.  This Court has construed the word "com-
pensation" as used presently in section 236 of the
Flint charter.  The Court was required to interpret
the phrase "Like classifications of work are to re-
ceive like compensation" in *Kane* v. *City of Flint*
(1955), 342 Mich 74.  Holding that strict dollar
equality was not necessary, the Court said at p
78:

"The city commission, in fixing the 'compensation'
to be paid to firemen and policemen took into con-
sideration certain benefits afforded them by the
city which were not shared in by other city em-
ployees."

This Court expressly held (p 79):

"The provision in the civil service amendment
(Sec. 236[a]) on which the plaintiffs wholly rely,
must be read and construed in connection with other
provisions of the charter."

In the light of this case, section 264(d) should also be construed "in connection with the other provisions of the charter" and particularly related provisions which add meaning.

Section 36A of the charter is of particular significance to the construction of section 264. Unlike the situation as to any other city employee, it spells out in detail the permissible "on duty" periods of employment for firemen. The section reads as follows:

"It shall be unlawful for the city of Flint, or any officer or employee thereof, to require any person in the employ of the fire department of said city who is engaged in fire fighting or subject to the hazards thereof *to be on duty* in such employment more than 24 hours, or to be off duty less than 24 consecutive hours out of any 48-hour period; provided, that all persons in the employ of said fire department who are engaged in fire fighting or subject to the hazards thereof shall be entitled to an additional 24 consecutive hours off duty in every 8-day period, thereby requiring firemen to work not more than an average of 63 hours per week." (Emphasis supplied.)

It is significant that this section speaks of firemen as being "on duty" even though it also refers to firemen working an average of 63 hours per week. The distinction is warranted as to an employee who puts in a 24-hour day during which time he is afforded an opportunity to eat, recreate, and sleep as opposed to the normal employment of an employee who works a 7- or 8-hour day.

The second phrase asserted to be clear and unambiguous is "normal work week." Plaintiffs say clarity is manifest by insertion of the word "whose" immediately before this phrase in the first sentence of section 264(d) which merely requires determina-

tion of each employee's work week. Plaintiffs urge that the only meaning that can be ascribed to these words when applied to firemen is "average hour work week," which they claim equals a "normal work week."

Plaintiffs do not, however, have a normal work week. They are on duty for three 24-hour periods per week during 5 weeks and two 24-hour periods per week for 3 weeks of an 8-week cycle. Their employment is out-of-the-normal. The 8-week cycle of hours on duty falls within the variable work week pattern. This alone is perhaps not of major significance. But when the total picture is considered it must be concluded that the words "normal" and "work" and "week" all require clarification, definition, and construction, none of which is contained in the charter amendment. The necessary construction, however, is provided by the legislative history of what was intended in adopting the amendment, by what was done in the pay ordinance immediately thereafter, and by the actions of all concerned—the city, its citizens, the firemen—over a period of more than 8 years.

The words "compensation" and "normal work week" used in section 264(d) are not so clear and unambiguous that resort to interpretative aids may not be had.

Finally, as has already been noted in connection with the legislative history of the charter, the basic principle that like classifications of work are to receive like compensation was written into the charter by the 1935 civil service amendment. The 1951 amendment was an effort to attain even greater equality. It dealt with the problem of the *normal work week*. In the normal situation, hours of work are a basic yardstick for measuring compensation and it is, therefore, only equitable that compensation for a greater or lesser number of hours should

be directly proportioned. But hours spent in sleeping, even on the job, are not normally considered to be working hours, although some benefit may accrue to the employer. Because of the peculiar nature of plaintiff-firemen's employment it was necessary to equate the total hours *on duty* to a certain number of *work hours*. This had been done before the amendment of 1951. It is unquestioned that no one intended a change in this arrangement under the terms of that amendment. The problem before the city when the amendment was adopted was equalization of pay for employees of the city, of the park board, and of Hurley Hospital. The question proposed to the voters on the adoption of the amendment was so stated. It read:

"Do you favor amending the city of Flint charter by adding *section 264* which *provides for a single pay plan for employees of the city, park board and Hurley Hospital* under which all employees within the same occupational level as determined by civil service commission *receive the same compensation?*" (Emphasis supplied.)

While the firemen's average week of on-duty hours amounts to 63, it is evident that their average work week by long construction of the parties is 44 hours out of the 63 and they were properly compensated on that basis.

The judgment of the trial court is reversed and the cause is remanded for entry of judgment of no cause of action. No costs will be allowed, a public question being involved.

Kavanagh, C. J., and Dethmers, Kelly, Black, Souris, and O'Hara, JJ., concurred.

Smith, J., did not sit.

### On Application for Rehearing.

Per Curiam. Section 36A of the charter for the city of Flint was construed *in conjunction with* other charter provisions to determine firemen's claimed right to compensation under said charter. Such construction has no application to holdings of the Court in *Grosse Pointe Park Fire Fighters Ass'n* v. *Village of Grosse Pointe Park,* 303 Mich 405, or *Dearborn Fire Fighters Association, Local No. 412,* v. *Herdzik,* 319 Mich 345, wherein PA 1925, No 125, as amended (the State hours-of-firemen statute)* was considered.

---

* See CL 1948, § 123.841 *et seq.* (Stat Ann 1958 Rev § 5.3331 *et seq.*).—Reporter.